IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **KICKZ**, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 4:24-cv-00824-O-BP |
| | § | |
| **CHUBB LLOYDS INSURANCE** | § | |
| **COMPANY OF TEXAS**, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Before the Court are the Motion to Exclude the Expert Testimony of Kyle Lynch, brief in support, and appendix that Defendant ACE Property and Casualty Insurance Company ("ACE") filed on October 24, 2025 (ECF Nos. 67-68), as well as the response that Plaintiff Ramadan T. Shabazz filed on October 26, 2025 (ECF No. 69). Having considered the pleadings and applicable legal authorities, the undersigned **RECOMMENDS** that Chief United States District Judge Reed O'Connor **GRANT** ACE's Motion and **EXCLUDE** the testimony of Kyle Lynch.

**I.    BACKGROUND**

This case involves an insurance policy that ACE issued to Kickz in April 2023 for up to $2 million in personal property coverage for the contents of a storage unit in Fort Worth. ECF No. 67 at 6. On June 2, 2023, a fire destroyed that storage unit, incinerating the building and its contents, including computer equipment purchased from Slooth, Inc. *Id.* Shabazz, the owner of Kickz, submitted an insurance claim for the loss, seeking the policy's limits. *Id.* On July 20, 2023, Marcus Harris, a representative of Slooth, Inc., emailed ACE a price list for the suggested values of each item lost in the fire. *Id.* On January 16, 2024, an adjuster employed by ACE informed

1

Shabazz that his claim had been denied. ECF No. 1-3 at 4. Shabazz then brought the present suit. *See id.*

On August 18, 2025, Shabazz designated Kyle Lynch as his expert on "the extent of the damage to Plaintiffs' property following the loss, the cause of those damages, the recommended repairs for those damages, and the costs of those replacements." ECF No. 31 at 2. In accordance with Federal Rule of Civil Procedure 26(a)(2)(B), Shabazz included Lynch's expert report in that filing. *Id.* at 26-29. ACE deposed Lynch on October 10, 2025. ECF No. 67 at 7. ACE now moves to exclude Lynch's testimony from trial, arguing that it is inadmissible because it does not qualify under Federal Rule of Evidence 702. *Id.* at 5.

## II.   LEGAL STANDARDS

Federal Rule of Evidence 702 governs the admissibility of expert testimony in federal court. The rule provides:

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

Rule 702 "charges [the] trial court[] to act as a 'gate-keeper[].'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002). In pursuit of this role, the Court may only admit proffered expert testimony if the proponent, who bears the burden of proof, demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

2

"Before a district court may allow a witness to testify as an expert, it must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009) (quoting Fed. R. Evid. 702). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Id.*

"The object of Rule 702 is to protect juries from unreliable and irrelevant expert testimony." *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 26 F.4th 256, 268 (5th Cir. 2022). To be relevant, "expert testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Pipitone*, 288 F.3d at 245 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). "Relevance depends upon 'whether [the expert's] reasoning or methodology properly can be applied to the facts in issue.'" *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 593).

The Court must also "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589 (1993). To determine the reliability of expert testimony, the Court considers five non-exclusive factors that the court developed in *Daubert*: (1) "whether [the theory or technique] can be (and has been) tested;" (2) "whether the theory or technique has been subjected to peer review and publication;" (3) "the known or potential rate of error;" (4) "the existence and maintenance of standards controlling the [theory or] technique's operation;" and (5) whether the theory or technique has "general acceptance" within the scientific community. *Daubert*, 509 U.S. at 593-94; *see also Vargas v. Lee*, 317 F.3d 498, 500 (5th Cir. 2003). In evaluating these factors, the Court must focus on the reasoning or methodology underlying the expert testimony, not the ultimate conclusion. *See Daubert*, 509 U.S. at 594; *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997). At the most basic level, the *Daubert*

factors act "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 618 (5th Cir. 1999) (quoting *Kumho Tire*, 526 U.S. at 152).

The test of reliability is "a flexible one." *Kumho Tire*, 526 U.S. at 138; *Daubert*, 509 U.S. at 594. The Supreme Court has recognized the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire*, 526 U.S. at 150. A trial court has broad latitude to determine whether Daubert's specific factors are, or are not, reasonable measures of an expert's reliability in a particular case. *See id.* at 152. After all, not every case will require an expert proficient in a scientific discipline. *See id.* at 141 (explaining that the Court's "gatekeeping" role applies to testimony based on technical and other specialized knowledge just as much as it does to testimony based on scientific knowledge). Importantly, it is the proponent of the proffered expert testimony who bears the burden of demonstrating "by a preponderance of the evidence that the testimony is reliable." *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

Finally, "the rejection of expert testimony is the exception rather than the rule." *See* Fed. R. Evid. 702, adv. comm. notes (2000). "[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system: '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty.*, 80 F.3d 1074, 1078 (5th Cir. 1996) (quoting *Daubert*, 509 U.S. at 596).

### III.     ANALYSIS

#### A.     Lynch's qualifications

"First, an expert must be qualified. 'Before a district court may allow a witness to testify as an expert, it must be assured that the proffered witness is qualified to testify by virtue of his knowledge, skill, experience, training, or education.'" *Aircraft Holding Sols., LLC v. Learjet, Inc.*, No. 3:18-cv-823-D, 2022 WL 3019795, at *5 (N.D. Tex. July 29, 2022) (quoting *Cooks*, 589 F.3d at 179)).

Lynch is the owner of SupportCliq LLC, a "[s]ales, support, and back[]office management" technical service provider that engages in "PC sales and support as well as network installation and maintenance." ECF No. 31 at 25. Lynch's business focus is typically home offices and small to medium businesses, ECF No. 68-4 at 7, but he also has worked in support and consultative roles for larger scale data centers with "wide-area networks" and "cloud-based infrastructure." *Id.* at 7-8. He holds an associate's degree from Computer Learning Center, which Lynch indicated is a subsidiary program of a Brown College, where he "learned to build computers and networks." *Id.* at 4. Lynch also previously worked as a microcomputer specialist for four years at Deloitte & Touche. *Id.* Following this stint, he attended a variety of trade schools and obtained certain certifications in networking, as well as trade certifications such as HVAC and electrician's licenses. *Id.* at 4-5.

Lynch characterizes his experience as follows: "[s]pecializing in network design, installation, and maintenance from small businesses to Fortune 500 companies." ECF No. 31 at 26. He explains that this background "qualifies [him] to perform" an expert assessment of the "lost computer room damages resulting from the fire." *Id.*

ACE disagrees. ECF No. 67 at 9. It argues principally that because the computer equipment lost in the storage unit fire was "enterprise or data center equipment," *id.*; ECF No. 68-4 at 7, and because such equipment is "more complex" than home office or small business computer equipment, Lynch does not have the requisite experience necessary to offer opinions on the replacement cost value of enterprise or data center equipment. ECF No. 67 at 9; ECF No. 68-4 at 7. "Lynch's experience involves working as a technical support specialist for already-implemented data centers; he has never been in a position where he was purchasing enterprise or data center components." ECF No. 67 at 9 (citing ECF No. 68-4 at 8-9).

Rule 702 states that an expert may be qualified based on "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. However, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009). The district court must "refuse to allow an expert witness to testify if he finds that the witness is not qualified to testify in a particular field or on a given subject," *id.*, not if it finds that the witness's credentials are not as robust as the other side would prefer. In the present case, Lynch provides his opinion on the valuation of various pieces of computer equipment. While he may not have professional experience with the purchasing department of a data center, the Court concludes that he is nonetheless qualified to perform the role he performed for Shabazz.

Lynch is a network engineer by profession. ECF No. 31 at 25. He holds an associate's degree in Network Management, which he obtained with honors. *Id.* He has professional experience as a microcomputer specialist. *Id.* He has spent the last decade or more selling, servicing, and installing computer components and computer networks. *See id.* His sales work has included selling "servers from [Texas] to Dubai, Oman, Holland, Europe." ECF No. 68-4 at 25.

6

And throughout his career, he has worked in support and consultative roles for larger scale data centers with "wide-area networks" and "cloud-based infrastructure." *Id.* at 7-8.

Further, a review of Lynch's report reveals that the equipment Lynch valued included computer servers, fans, cables, and similar equipment. ECF No. 31 at 27. While the scale of this particular hardware may easily have exceeded that of the average personal computer, Lynch's career experience has not been strictly limited to computer networks for personal or small business use. ECF No. 68-4 at 7-8. However, Lynch's assignment was to explain how the computer parts worked. Shabazz did not ask him to opine on the best way to install, repair, or configure high powered servers, nor did he call Lynch to testify on how to start, setup, or optimize a data center.

Lynch's task was simply to estimate the value of certain computer equipment that he would have almost certainly encountered in his career—or at the very least had enough familiarity with to recognize what these devices were, understand the general role they perform in a computer network (even a large scale one), and ascertain a sufficient estimate of their market value. *See Nunn v. State Farm. Mut. Auto. Ins. Co.*, No. 3:08-cv-1486-D, 2010 WL 2540754, at *3 (N.D. Tex. June 22, 2010) (finding that a car mechanic who lacked experience to "personally perform many of the [particular] repairs . . . needed," nonetheless was (by virtue of his experience in the industry) "an expert . . . in preparing preliminary estimates of repair costs.").

Casting Lynch's professional background against the singular role Shabazz asked him to play in this case, the Court concludes that Lynch is qualified as an expert under Rule 702 to perform a valuation of the machinery lost in the fire.

B.     **Reliability and relevance of Lynch's testimony**

"The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia."

7

*Knight*, 482 F.3d 347, 355 (5th Cir. 2007) (internal quotation marks omitted). "To be reliable, expert testimony must 'be . . . more than unsupported speculation or subjective belief.'" *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 293 (5th Cir. 2019) (quoting *Johnson v. Arkema, Inc.*, 685 F.3d 425, 459 (5th Cir. 2012) (per curiam)). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v Joiner*, 522 U.S. 136, 146 (1997).

In "conducting [this] analysis, the Court focuses on the reasonableness of the expert's approach regarding the matter to which his testimony is relevant and not on the conclusions generated by the expert's methodology." *Ramos v. Home Depot Inc.*, No. 3:20-cv-01768-X, 2022 WL 615023, at *1 (N.D. Tex. Mar. 1, 2022); *Daubert*, 509 U.S. at 595. "If, however, there is simply too great an analytical gap between the [basis for the expert opinion] and the opinion proffered, the court may exclude the testimony as unreliable." *Kim v. Nationwide Mut. Ins. Co.*, No. 3:21-cv-0345-D, 2022 WL 2670393, at *5 (N.D. Tex. July 11, 2022).

"[T]he [C]ourt's role under Rule 702 is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role—the [C]ourt's role is limited to ensuring that the evidence in dispute is at least sufficiently reliable . . . so that it is appropriate for the jury's consideration." *United States v. Perry*, 35 F.4th 293, 330 (5th Cir. 2022). In manning the *Daubert* gate, the Court must prohibit speculative and subjective assertions from masquerading as learned opinions in the presence of the jury. *See id.* But the Court's task is not to regard an expert opinion as convincing, and the Court cannot keep an expert opinion out on its credibility alone. *See id.*

ACE argues that Lynch's report is methodologically inadequate because it "does not identify the source of the [estimated] value for any specific items." ECF No. 67 at 10. Instead, the report "only lists generic websites (e.g., dell.com, serversupply.com, ebay.com) as the sources of

the values he determined, without providing any specific reference to a particular piece of machinery." *Id.* (citing ECF No. 31 at 28). ACE contends that because Lynch did not "provid[e] any specific details on how he determined the reasonableness of [the] values," there is "no analysis as to how the values were developed or why they are reasonable," thus making Lynch's opinions of those values unreliable. *Id.* at 10-11.

Next, ACE argues that although Lynch "claims that he knew the age of the equipment at issue" he did not include "that information . . . in his report," nor is that information found "in the Purchase Agreement—the only document that Lynch claims to have received in forming his opinions." *Id.* at 11 (citing ECF No. 68-4 at 13); *see* ECF No. 68-5 at 2-8. Additionally, ACE explains that Lynch did not have any information regarding the configurations of the computer parts lost in the fire, and that he admitted as much. ECF No. 67 at 11 (citing ECF No. 68-4 at 20).

Finally, ACE asserts that the reliability of Lynch's report suffers from two further defects. First, Lynch "wholesale adopted the replacement values" in his report "from a price list created" by Shabazz's associate Marcus Harris two years earlier in which every valuation Lynch estimated matched the valuations Harris gave the same pieces of equipment "to the penny." *Id.* at 12 (citing ECF No. 68-4 at 27); *compare* ECF No. 31 at 27, *with* ECF No. 68-6 at 2-5. Second, because Lynch stands to receive a 10% contingency fee on any amount Shabazz recovers in this suit, ACE alleges that Lynch's opinions are unreliably biased. ECF No. 67 at 12 (citing ECF No. 68-4 at 10-11). The Court will examine each alleged deficiency.

In his report, Lynch explains that his methodology involved using "[m]arket tracking software . . . to explore aggregate historical pricing data," "[r]eferenc[ed] online tools and forums to cross-verify manual valuations," and "appl[ied] inflation calculations or trend-based valuations for each item" to compare current market prices for the various computer parts lost in the storage

9

unit fire and generate an estimate of those parts' values. ECF No. 31 at 26-29. On the surface, these efforts are not the makings of an *ipse dixit* opinion as ACE argues. ECF No. 67 at 11. Lynch represents that he at least did something more than generate wholesale random figures. While ACE argues Lynch did "not identify the source of the [estimated] value for any specific items," *id.* at 10; No. 31 at 26-29, "[a]s a general rule, questions relating to the . . . sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [trier of fact's] consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). Moreover, Lynch did provide reference citations, albeit unspecific ones. *See* ECF No. 31 at 28; *see also* ECF No. 68-4 at 21 ("Each one of these websites, for the most part, were used for each individual piece of equipment."). But an expert opinion's lack of specificity is a critique for the jury to ponder. It does not govern the opinion's admissibility.

Further, researching the market price of products like those lost or destroyed to estimate those destroyed products' value is generally a reliable methodology. *See Hoffman v. L&M Arts*, No. 3:10-cv-0953-D, 2013 WL 432771, at *13 (N.D. Tex. Feb. 5, 2013) (using the "fair market value" as the type of valuation and "market data comparison" as the valuation approach was "neither unreliable nor irrelevant," even where opponents criticized how the expert conducted that methodology"); *HostingXtreme Ventures, LLC v. Bespoke Grp., LLC*, No. 3:14-cv-1471-M, 2017 WL 3434296, at *4 (N.D. Tex. Aug. 9, 2017) (comparing transaction invoices for agricultural products, even where the expert acknowledged that certain variables could introduce error into his opinion on the fair market value of the products, was not an unreliable methodology); *Gibson v. Chubb Nat'l Ins. Co.*, 724 F. Supp. 3d 780, 789 (N.D. Ill. 2024) ("Whatever one might say about the lack of specificity about the items Smith researched to arrive at her valuations, the methodology

10

she employed is sufficiently reliable. That methodology consisted of researching comparable items in order to arrive at valuations.").

The Court concludes that the lack of precision with which Lynch explained his methodology is not a sufficient reason to exclude his testimony. Lynch's methodology may not have been as robust as it could have been, but ACE would have ample ability to cross-examine Lynch on the flaws it perceives in his efforts if the Court permitted Lynch's testimony at trial. *Daubert*, 509 U.S. at 596.

ACE also argues that because Lynch stands to receive a 10% contingency fee on any amount Shabazz recovers in this suit, Lynch's opinions are unreliably biased. ECF No. 67 at 12 (citing ECF No. 68-4 at 10-11). This argument attacks Lynch's credibility, not the reliability of this methodology, and would likewise be an appropriate point to use for cross-examination at trial, but not this stage.

Finally, ACE alleges Lynch's report is unreliable because he did not include the age of the equipment or know the configuration of certain equipment. ECF No. 67 at 11 (citing ECF No. 68-4 at 20-21). Lynch testifies that his estimates reflected "current values o[f] . . . depreciated equipment," ECF No. 68-4 at 20, and that he "wasn't asked" to research the values of any particular configuration and instead "assume[d]" them. *Id.* at 21.

As a general matter, an expert witness can rely on assumptions when reaching his opinions. *See Daubert*, 509 U.S. at 589; *Kumho Tire*, 526 U.S. at 153–54; *Nova Consulting Grp., Inc. v. Eng'g Consulting Servs., Ltd.*, 290 F. Appx. 727, 732–33 (5th Cir. 2008) (holding that an expert's opinion was not rendered unreliable merely because he made several assumptions). However, those assumptions must have some factual basis in the record and an underlying rationale. *See Moore*, 547 F. Appx. at 516. Lynch's assumptions lack that kind of support.

Strictly speaking, the excerpts of Lynch's deposition that ACE provided only reveal that Lynch assumed the configurations of two types of devices: 1) HPE ProLiant DL360 Gen10 Servers 6248 1P 32GB-R and 2) Unisys ES7000/one Large Xeon Servers. *See* ECF No. 68-4 at 19-22; ECF No. 31 at 27. Lynch does not outright testify that he assumed the configuration of every item. *See generally* ECF No. 68-4. But he did testify that aside from Shabazz's original purchase agreement with Slooth, Inc. (to which Harris' price list was attached), ECF No. 67 at 12 n.39, he did not receive any other documents from Shabazz that identified the equipment he wanted Lynch to value. ECF No. 68-4 at 13. Lynch also testified that Shabazz asked him to "assess the value of said equipment," not to compare that equipment with items of "like kind and quality." *Id.* at 26. Critically, he also testified that computer equipment's specific configurations are variables that could impact that equipment's price. *See id.* at 20-21.

Resultantly, because Lynch's task in this case was to value the specific equipment lost in the fire—and not items of like kind and quality—and because configuration affects price, then by his own testimony Lynch needed to ascertain the specific configurations of these specific items to generate an accurate estimate. Yet he did not explain how he did so, or indeed even testify that he did so at all. *See generally id.* At most, he testified that for at least two of the items, he assumed the configurations. *Id.* at 19-22; ECF No. 31 at 27. But simply assuming the items' configurations, without more, does not suffice.

When counsel for ACE asked Lynch what configuration he assumed in developing at least one of his price estimates, he simply replied with one word: "Research." *Id.* at 21. When counsel pressed him that one has "to enter the configuration data in order to determine" the price, Lynch only explained that "[t]his being [his] first time, [he] wasn't prepared to be so specific in detail[ing] that information." *Id.* These explanations present neither a factual basis in the record nor an

12

underlying rationale to undergird the assumptions he made in developing his opinion. Nor does the record present any insight into what configuration assumptions would have been reasonable. Lynch does not testify that he had any conversation with Shabazz about this information. *See generally id.*; *id.* at 27. And a review of both the purchase agreement (ECF No. 68-5 at 2-8) and Harris' list (ECF No. 68-6 at 2-5) finds that neither document contains information about the various items' configurations.

Because considering the specific configurations of the specific computer items in Shabazz's storage unit was a necessary analytical step in reasonably estimating those items' value—and the record does not reflect that Lynch did so—the undersigned concludes that this deficiency in Lynch's report goes beyond just the weight of the evidence and instead reaches its admissibility. "A court may conclude that there is simply too great an analytical gap between the data and the opinion offered." *Gen. Elec. Co.*, 522 U.S. at 147.

Moreover, when deposed, Lynch agreed that he "wholesale adopt[ed] the [valuation] numbers" that Harris previously came up with. ECF No. 68-4 at 27 (citing ECF No. 68-6 at 2-5). ACE thus complains that "[w]hile Lynch claims that he verified those numbers, he provides no independent analysis or specific references as to why those numbers are valid." ECF No. 67 at 12. For his part, Lynch testified that "he did a thorough search of each individual part, verif[ying] that all of it [was] an adequate assessment of what a network environment should be." ECF No. 68-4 at 27. But if that "thorough search," even though it was ostensibly independent, still assumed without support or outright omitted an analysis of pertinent valuation variables, then that search was not sufficiently independent. *See also* ECF No. 68-4 at 19 ("[W]ithout me selling the equipment, I have no way of determining whether it's a new device or if it is actually, you know, a used device."). As a matter of law, an expert's acceptance of values without independent analysis

of their validity is clear ground to exclude an expert opinion. *See Jacked Up, LLC v. Sara Lee Corp.*, 291 F. Supp. 3d 795, 808-09 (N.D. Tex. 2018); *Sportsband Network Recovery Fund, Inc. v. PGA Tour, Inc.*, No. 96-11164, 1998 WL 44564, at *9 (5th Cir. 1998).

"Although the basis of an expert's opinion usually goes to the weight and not the admissibility of expert testimony, in some cases the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion." *VeroBlue Farms USA Inc. v. Wulf*, No. 3:19-cv-764-X, 2023 WL 348016, at *6 (N.D. Tex. Jan. 20, 2023).

This is one such case. "If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury. Furthermore, its lack of reliable support may render it more prejudicial than probative, making it inadmissible under Federal Rule of Evidence 403." *Viterbo*, 826 F.2d at 422. To be sure, "[a] few scattered errors in an expert report are not necessarily grounds for exclusion," *Moore v. Int'l Paint, LLC*, 547 F. App'x 513, 516 (5th Cir. 2013). However, if the configuration of computer equipment can affect the estimated price of that equipment, if the plaintiff tasked his expert witness with presenting an accurate estimate of the specific equipment's price, and if the expert failed to incorporate configuration information in his estimates, then the errors in a report like Lynch's are more than scattered. They are dispositive. *See id.* at 516-17 (affirming the exclusion of expert testimony where the expert "made a number of other assumptions that, while not strictly inconsistent with the evidence, had no basis in the record" and failed to "identif[y] some reason for assuming the factors he did for his analysis"); *Hathaway v. Bazany*, 507 F.3d 312, 318-319 (5th Cir. 2007) (an expert may not "overcome [an] evidentiary lack" with "the furtive inclusion . . . of supposed facts not in the record.").

Importantly, Shabazz "need not prove [Lynch's] testimony is factually correct," *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009), but he still bears an important

burden. He must "prove by a preponderance of the evidence that [Lynch's] testimony is reliable." *Id.* This he has not done.

Shabazz's response to ACE's motion principally argues that Defendants concealed their own valuation expert. *See* ECF No. 69. Where he does bring a separate argument, he contends without support that Lynch's "methodology [was] consistent with accepted valuated practices in the computer hardware industry" and argues that "[f]undamental fairness requires that if Defendant relied on a third-party appraisal to value the loss, Plaintiff's independent expert should be allowed to present comparable testimony." Notwithstanding a lack of legal support for this latter position, the issue with Lynch's report is not that he was a third party, but that he insufficiently assumed or outright omitted important variables in assessing the value of the computer parts at the heart of this suit. The undersigned concludes that Shabazz has not carried his burden to demonstrate that Lynch's report is reliable by a preponderance of the evidence.

Consequently, for these reasons, the undersigned concludes that Lynch's report is unreliable, warranting the exclusion of his testimony. Consequently, Lynch's report is likewise irrelevant. Relevance of an expert opinion is a question of whether "the reasoning or methodology 'fits' the facts of the case and will thereby assist the trier of fact to understand the evidence." *Daubert*, 509 U.S. at 591; *Knight*, 482 F.3d at 352. "[F]undamentally unsupported" opinions "offer[] no expert assistance to the jury" and should be excluded. *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005); *Viterbo*, 826 F.2d at 422.

### IV. CONCLUSION

Although "the rejection of expert testimony is the exception rather than the rule," Fed. R. Evid. 702, adv. comm. notes (2000), and the Court permits experts "wide latitude to offer opinions," *Daubert*, 509 U.S. at 592, the *Daubert* gate is only so wide, and the Court is called to

keep that gate, not expand it. The undersigned concludes that finding Lynch's valuation reliable would erroneously permit unreliable evidence before a potential jury. Accordingly, the undersigned **RECOMMENDS** that Chief Judge O'Connor **GRANT** Defendant's Motion to Exclude Kyle Lynch's expert testimony.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. See 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b)(1). To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. See *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *modified by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections to 14 days).

**SIGNED** on November 4, 2025.

_____
Hal R. Ray, Jr.
UNITED STATES MAGISTRATE JUDGE